FILED IN
COURT OF CRIMINAL APPEALS

February 23, 2015

ABEL ACOSTA, CLERK

AP-77,054
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 2/23/2015 3:22:39 PM
Accepted 2/23/2015 3:58:29 PM
ABEL ACOSTA
CLERK

No. AP-77,054

IN THE

# Court of Criminal Appeals of Texas

RODNEY REED,
*Appellant,*

v.

THE STATE OF TEXAS
*Appellee.*

On Appeal from the 21st Judicial District Court, Bastrop County, Texas

**STATE'S BRIEF**

**ORAL ARGUMENT CONDITIONALLY REQUESTED**

BRYAN GOERTZ
Criminal District Attorney
Bastrop County, Texas

MATTHEW OTTOWAY
Assistant Attorney General/
Assistant District Attorney
Bastrop County, Texas
Texas Bar No. 24047707

Post Office Box 12548, Capitol Station
Austin, Texas 78711
Tel.: (512) 936-1400
Fax: (512) 320-8132
Email: *matthew.ottoway@texasattorney
general.gov*

*Attorneys for the State*

# IDENTITIES OF PARTIES AND COUNSEL

*Appellant*
>Rodney Reed

*Appellant's hearing and appeal counsel*
>Bryce Benjet
>The Innocence Project
>40 Worth Street, Suite 701
>New York New York 10013
>
>Andrew MacRae
>Levatino|Pace, LLP
>1101 S. Capital of Texas Highway
>Building K, Suite 125
>Austin, Texas 78746

*Appellee*
>The State of Texas

*Appellee's hearing and appeal counsel*
>Bryan Goertz
>Criminal District Attorney of Bastrop County
>804 Pecan Street
>Bastrop, Texas 78602
>
>Matthew Ottoway
>Travis Bragg
>Assistant Criminal District Attorneys/
>Assistant Attorneys General
>Post Office Box 12548, Capitol Station
>Austin, Texas 78711

# TABLE OF CONTENTS

IDENTITIES OF PARTIES AND COUNSEL ...........................................i

TABLE OF CONTENTS ...................................................................ii

INDEX OF AUTHORITIES ...............................................................iv

STATEMENT OF THE CASE ..............................................................1

STATEMENT REGARDING ORAL ARGUMENT .................................1

ISSUES PRESENTED ........................................................................2

STATEMENT OF THE FACTS ............................................................2

I.    Appellant's litigation history ..............................................2

II.   Evidence at Appellant's trial .............................................. 7

SUMMARY OF THE ARGUMENT .......................................................15

ARGUMENT ....................................................................................17

I.    The standards for DNA testing and appellate review....................17

II.   Appellant's motion lacked the required specificity necessary to prove compliance with Chapter 64's requirements .......................19

III.  The trial court was correct in finding that Appellant did not meet his burden of proving that he would not have been convicted with exculpatory test results.........................................27

      A.   Appellant's lack of specificity worked to his detriment .......28

      B.   The trial court properly eschewed Appellant's request to consider post-trial evidence and such evidence is not properly before this Court..................................................29

      C.   The trial court applied the proper exculpatory-result presumption..........................................................32

      D.   Appellant failed to prove by a preponderance of the evidence that he would not have been convicted armed with exculpatory test results .............................................36

| | | |
|---|---|---|
| 1. | Items found on Stites | 36 |
| 2. | Items found near Stites | 39 |
| 3. | Item discovered by a citizen | 39 |
| 4. | Items found in or near the truck | 40 |
| 5. | Items presently in the possession of the Bastrop District Clerk | 41 |

IV. The trial court's finding of unreasonable delay is amply supported by the record .................................................. 42

    A. The timing, breadth, and ambiguity of Appellant's DNA testing request support the finding of unreasonable delay .................................................................. 45

        1. Time between Appellant's request and his execution date ................................................ 46

        2. Promptness of the request and previous opportunities to request testing ....................... 47

    B. Appellant's overall litigation history left little doubt that his Chapter 64 motion was filed for purposes of unreasonable delay ............................... 53

V. Appellant failed to prove chain of custody for items housed by the Bastrop District Clerk .......................................... 55

VI. Appellant did not prove biological material on the non-per se items he sought to test ................................................ 58

VII. The State re-urges its motion to accelerate this appeal ............. 61

PRAYER FOR RELIEF ...................................................................... 62

WORD-LIMIT CERTIFICATE OF COMPLIANCE ............................ 63

CERTIFICATE OF SERVICE ............................................................ 63

# INDEX OF AUTHORITIES

**Cases**

*Bell v. State*, 90 S.W.3d 301 (Tex. Crim. App. 2002)..............................44

*Blacklock v. State*, 235 S.W.3d 231 (Tex. Crim. App. 2007)...........*passim*

*Clarke v. State*, 270 S.W.3d 573 (Tex. Crim. App. 2008)........................26

*Dinkins v. State*, 84 S.W.3d 639 (Tex. Crim. App. 2002)............26, 27, 28

*Esparza v. State*, 282 S.W.3d 913 (Tex. Crim. App. 2009)..........35, 36, 37

*Ex parte Gutierrez*, 337 S.W.3d 883 (Tex. Crim. App. 2011)......37, 42, 46

*Holberg v. State*, 425 S.W.3d 282 (Tex. Crim. App. 2014)..............*passim*

*Lucio v. State*, 351 S.W.3d 878 (Tex. Crim. App. 2011).........................39

*Mays v. State*, 285 S.W.3d 884 (Tex. Crim. App. 2009).........................32

*Pace v. DiGuglielmo*, 544 U.S. 408 (2005)................................................55

*Pate v. State*, No. 10-09-00360-CR, 2011 WL 652920
(Tex. App.—Waco Feb. 23, 2011, pet. ref'd)...................................63

*Prible v. State*, 245 S.W.3d 466 (Tex. Crim. App. 2008).........................61

*Riggins v. State*, No. 11-03-00307-CR, 2004 WL 743742
(Tex. App.—Eastland Apr. 8, 2004, no. pet.).................................63

*Rivera v. State*, 89 S.W.3d 55 (Tex. Crim. App. 2002).....................19, 48

*Rosales v. State*, 748 S.W.2d 451 (Tex. Crim. App. 1987).................55, 59

*Routier v. State*, 273 S.W.3d 241 (Tex. Crim. App. 2008)...........20, 33, 34

*Skinner v. State*, 122 S.W.3d 808 (Tex. Crim. App. 2003)................48, 57

*Skinner v. State*, 293 S.W.3d 196 (Tex. Crim. App. 2009)......................57

*Skinner v. State*, No. AP-76675, 2012 WL 2343616
(Tex. Crim. App. June 20, 2012)......................................................57

*State v. Patrick*, 86 S.W.3d 592 (Tex. Crim. App. 2002).............47, 51, 52

*State v. Swearingen*, 424 S.W.3d 32 (Tex. Crim. App. 2014)..........*passim*

*Swearingen v. State*, 189 S.W.3d 779 (Tex. Crim. App. 2006)...............57

*Swearingen v. State*, 303 S.W.3d 728 (Tex. Crim. App. 2010)...............57

*Thacker v. State*, 177 S.W.3d 926 (Tex. Crim. App. 2005)..........49, 52, 53

*Whitaker v. State*, 160 S.W.3d 5 (Tex. Crim. App. 2004)......................31

*Whitehead v. State*, 130 S.W.3d 866 (Tex. Crim. App. 2004) .........*passim*

*Wilson v. State*, 185 S.W.3d 481 (Tex. Crim. App. 2006)........................29

**Statutes**

Tex. Code Crim. Proc. art. 64.01 (a)(2) ...................................................20

Tex. Code Crim. Proc. art. 64.01(a) ......................................................19

Tex. Code Crim. Proc. art. 64.01(a)(1) ...................................................20

Tex. Code Crim. Proc. art. 64.01(a–1) ........................................17, 59, 64

Tex. Code Crim. Proc. art. 64.01(b) ................................................18, 19

Tex. Code Crim. Proc. art. 64.01(b)(1) ...................................................20

Tex. Code Crim. Proc. art. 64.01(b)(2) ...................................................20

Tex. Code Crim. Proc. art. 64.03(a)(1) ...................................................18

Tex. Code Crim. Proc. art. 64.03(a)(1)(A)(i).............................................64

Tex. Code Crim. Proc. art. 64.03(a)(1)(A)(ii) ...............................60, 63, 64

Tex. Code Crim. Proc. art. 64.03(a)(2) ...................................................18

Tex. Code Crim. Proc. art. 64.03(a)(2)(A) ...............................................29

Tex. Code Crim. Proc. art. 64.03(a)(2)(B) ........................................47, 52

**Other Authorities**

Act of April 5, 2001, 77th Leg., R.S., ch. 2, § 2,
   2001 Tex. Sess. Law Serv. Ch. 2 .......................................................49

Act of June 17, 2011, 82nd Leg., R.S., ch. 366, § 1–4,
   2011 Tex. Sess. Law Serv. Ch. 366 .................................................49

**Rules**

Tex. R. Evid. 404(b) .................................................................................60

Tex. R. Evid. 406 ......................................................................................60

## STATEMENT OF THE CASE

This is an appeal from the denial of DNA testing in a death penalty case. Appellant moved for DNA testing pursuant to Chapter 64 of the Texas Code of Criminal Procedure ("Chapter 64 motion"). 2.CR(DNA).74–143.[1] The State opposed. 2.CR(DNA).161–229, 307–29. The trial court held a live evidentiary hearing, which concluded with the denial of Appellant's Chapter 64 motion. 4.RR(DNA).227.[2] The trial court entered written findings thereafter. 3.CR(DNA).362–68. Appellant then filed his notice of appeal. 3.CR(DNA).359. The appeal is now before the Court.

## STATEMENT REGARDING ORAL ARGUMENT

The State believes that oral argument should be denied. Many of the issues in this case have been authoritatively decided, the parties' briefs adequately lay out the facts and legal arguments, and the decisional process would not be significantly aided by oral argument, especially given Appellant's rapidly approaching execution date.

---

[1]    "CR(DNA)" refers to the clerk's record for the Chapter 64 proceeding. The references are preceded by volume number and followed by page numbers.

[2]    "RR(DNA)" refers to the reporter's record for the Chapter 64 hearing. The references are preceded by volume number and followed by page numbers.

Nevertheless, should the Court determine that oral argument is appropriate, the State requests an opportunity to respond.

## ISSUES PRESENTED

Whether the trial court erred by finding that Appellant did not prove, by a preponderance of the evidence, that he would not have been convicted of capital murder assuming exculpatory DNA test results?

Whether the trial court erred by finding that Appellant did not prove, by a preponderance of the evidence, that his request for DNA testing was not made to unreasonably delay the execution of his sentence or the administration of justice?

Whether Appellant's Chapter 64 motion was sufficiently specific to meet all of Chapter 64's statutory requirements?

Whether there was an adequate chain of custody established for items housed by the Bastrop District Clerk?

Whether Appellant proved that the items he wanted tested were or contained biological material?

## STATEMENT OF THE FACTS

### I. Appellant's litigation history

A jury found Appellant guilty of capital murder for abducting, raping, and strangling to death Stacey Stites, and he was sentenced to death on May 30, 1998. 1.CR.489–493.[3] Appellant's conviction was

---

[3] "CR" refers to the clerk's record for Appellant's capital murder trial. The references are preceded by volume number and followed by page numbers.

affirmed on direct appeal by this Court on December 6, 2000, *Reed v. State*, No. 73,135 (Tex. Crim. App. Dec. 6, 2000) (*Reed I*), and the Supreme Court of the United States denied Appellant a writ of certiorari later that next year, *Reed v. Texas*, 534 U.S. 955 (2001).

With direct appeal pending, Appellant filed an application for state habeas relief on November 15, 1999. 2.SHCR-01/02, at 2–251.[4] A little more than a year later, Appellant filed a "supplemental claim." 3.SHCR-01/02, at 391–402. On February 13, 2002, this Court denied Appellant's initial application on findings by the trial court sitting in habeas and found the "supplemental claim" to be a subsequent application and dismissed it as abusive. *Ex parte Reed*, Nos. 50,961-01, 50,961-02 (Tex. Crim. App. Feb. 13, 2002) (*Reed II*).

Appellant turned to federal court on February 13, 2003, filing a petition for writ of habeas corpus in the Western District of Texas, Austin Division. Petition for a Writ of Habeas Corpus, *Reed v. Thaler*, No. A-02-CV-142-LY (W.D. Tex. Sept. 26, 2012). The case was stayed and placed in abeyance on March 1, 2004, so that Appellant could exhaust certain

---

[4] "SHCR-01/02" refers to the clerk's record for Appellant's first and second state habeas proceedings. The references are preceded by volume number and followed by page numbers.

claims through the state system. Order, Mar. 1, 2004, *Reed v. Thaler*, No. A-02-CV-142-LY (W.D. Tex. Sept. 26, 2012). Appellant thereafter proceeded to file four additional state habeas applications.

On March 29, 2005, Reed filed his third state habeas application. 1.SHCR-03, at 2–343.[5] On October 19, 2005, this Court dismissed all of Appellant's claims as abusive, with the exception of two claims that were remanded to the trial court for factual development. *Ex parte Reed*, No. WR-50961-03, 2005 WL 2659440, at *1 (Oct. 19, 2005) (*Reed III*). After a live evidentiary hearing and findings from the trial court, this Court issued an exhaustive opinion denying relief and finding that Appellant's gateway-innocence claim was not persuasive enough to overcome the untimeliness of his procedurally defaulted claims. *Ex parte Reed*, 271 S.W.3d 698 (Tex. Crim. App. 2008) (*Reed IV*).

With his third state habeas application pending, Appellant filed his fourth and fifth state habeas applications on March 5, 2007, and July 16,

---

[5]     "SHCR-03" refers to the clerk's record for Appellant's third state habeas proceeding. The references are preceded by volume number and followed by page numbers.

4

2008, respectively. SHCR-04, at 2–15;[6] SHCR-05, at 2–89.[7] Both of these applications were dismissed as abusive by this Court in a single opinion. *Ex parte Reed*, Nos. WR-50,961-04, WR-50,961-05, 2009 WL 97260, at \*1–6 (Tex. Crim. App. Jan. 14, 2009) (*Reed V*).

After those proceedings terminated, Appellant filed his sixth state habeas application on April 21, 2009. SHCR-06, at 2–59.[8] This, too, was dismissed as abusive by this Court. *Ex parte Reed*, No. WR-50961-06, 2009 WL 1900364, at \*1–2 (Tex. Crim. App. July 1, 2009) (Reed VI).

The stay in federal district court was lifted on August 20, 2009. Order, Aug. 20, 2009, *Reed v. Thaler*, No. A-02-CV-142-LY (W.D. Tex. Sept. 26, 2012). On June 12, 2012, a federal magistrate judge recommended denial of relief, Report and Recommendation of the United States Magistrate Judge, *Reed v. Thaler*, No. A-02-CV-142-LY (W.D. Tex. Sept. 26, 2012), which the federal district judge largely adopted, and who

---

[6] "SHCR-04" refers to the clerk's record for Appellant's fourth state habeas proceeding. The references are preceded by volume number and followed by page numbers.

[7] "SHCR-05" refers to the clerk's record for Appellant's fifth state habeas proceeding. The references are preceded by volume number and followed by page numbers.

[8] "SHCR-06" refers to the clerk's record for Appellant's sixth state habeas proceeding. The references are preceded by volume number and followed by page numbers.

independently denied relief on September 26, 2012, Order on Report and Recommendation, *Reed v. Thaler*, No. A-02-CV-142-LY (W.D. Tex. Sept. 26, 2012). The federal district judge also denied all of Appellant's post-judgment filings on February 4, 2013. Order, Feb. 4, 2013, *Reed v. Thaler*, No. A-02-CV-142-LY (W.D. Tex. Sept. 26, 2012).

Appellant then appealed the denial of federal habeas relief, but the Court of Appeals for the Fifth Circuit affirmed on January 10, 2014. *Reed v. Stephens*, 739 F.3d 753 (5th Cir. 2014) (*Reed VII*). On March 19, 2014, the same court also rejected Appellant's attempts at rehearing without a poll. On Petition for Rehearing and Rehearing En Banc, *Reed v. Stephens*, 739 F.3d 753 (5th Cir. 2014) (No. 13-70009). The Supreme Court of the United States denied Appellant's petition for writ of certiorari from this proceeding on November 3, 2014. *Reed v. Stephens*, 135 S. Ct. 435 (2014).

On April 8, 2014, the State requested the setting of Appellant's execution for November 19, 2014. 1.CR(DNA).34–35. The trial court heard the State's motion on July 14, 2014, and granted a modified execution date of January 14, 2015. 1.RR(DNA).17. The same day as the execution-setting hearing, July 14, 2014, Appellant filed his Chapter 64

6

motion.  2.CR(DNA).74–143.  Almost three months later, Appellant sought a hearing on the Chapter 64 motion.  3.CR(DNA).233–34.  Two weeks after that, Appellant filed an affidavit from a DNA analyst and an affidavit from his attorney verifying his Chapter 64 motion.  3.CR(DNA).240–56.  Then, the day before the Chapter 64 hearing, Appellant filed his personal affidavit.  3.CR(DNA).317–18.

After considering the record and evidence presented at the Chapter 64 hearing, the trial court denied Appellant's motion because Appellant failed to prove, by a preponderance of the evidence, that he would not have been convicted had exculpatory DNA test results been available at trial and that he did not file his Chapter 64 motion to unreasonably delay the execution of sentence or the administration of justice.  4.RR(DNA).227.  These findings were later reduced to writing.  3.CR(DNA).362–68.  The trial court also modified Appellant's execution date to March 5, 2015, for administrative reasons.  4.RR(DNA).227.  Appellant then filed his notice of appeal.  3.CR(DNA).359.

## II.   Evidence at Appellant's trial

Stacey Stites was a happily-engaged nineteen-year-old just eighteen days shy of her wedding.  43.RR.81–82, 85.  She lived in an

apartment complex with her police-officer fiancé, Jimmy Fennell, and her mother, Carol, who lived in the apartment below Stites's, and with whom Stites spent her last days alive planning her upcoming nuptials. 43.RR.81; 44.RR.51.

Stites worked at a Bastrop, Texas grocery store—the store was about thirty miles from her residence—and was scheduled for a 3:30 a.m. shift. 43.RR.95; 44.RR.48. When she did not show, a fellow employee became worried and eventually called Carol around 6:30 a.m. 43.RR.96, 101–02. In turn, Carol called Fennell, and he went to look for Stites while Carol informed authorities about Stites's absence. 44.RR.70–71.

Before Carol knew about Stites's disappearance, a Bastrop police officer had, at 5:23 a.m., discovered the pickup truck Stites took to work—Fennell's red, compact truck—seemingly abandoned in a local high school parking lot. 43.RR.117. Because the truck was not reported stolen, the officer took no further action. 43.RR.118,122. Before he left, however, he noticed a piece of a belt lying outside the truck. 43.RR.120.

Later that day, Stites's body was found off a rural road. 44.RR.18, 21. Texas Department of Public Safety (DPS) crime laboratory personnel processed the scene. 44.RR.108. They observed a partially clothed

8

Stites—her shirt removed, bra exposed, and missing a shoe and an earring. 44.RR.113. Her pants were undone, the zipper broken, and her panties were bunched at her hips. 44.RR.113–14, 122. She was discovered with work apparel—a nametag and a large knee brace. 44.RR.128, 151. On the side of the road was another piece of belt. 44.RR.115.

Because of obvious signs of rape, a DPS criminalist took vaginal and breast swabs from Stites's body. 44.RR.123; 45.RR.51. On-site chemical testing of a vaginal swab signaled the presence of semen. 44.RR.124–27. Around 11:00 p.m. that night, microscopic analysis showed the presence of intact sperm, which indicated recent seminal deposit—based on scientific articles, sperm remains whole within the vaginal cavity for usually no longer than twenty-six hours. 44.RR.131; 45.RR.15–16.

Later forensic testing matched the belt fragments to each other, and it appeared that the belt was torn apart, not cut, 47.RR.83–85, and Fennell identified the belt as Stites's, 45.RR.102. A search of the truck by DPS criminalists yielded Stites's missing shoe and earring, and the remnants of a smashed, plastic drinking glass. 47.RR.44–45; 49.RR.34,

9

38. Additionally, the driver's-side seatbelt was still engaged and the seat was angled in such a way that a 6'2" person could properly utilize the rearview mirror. 46.RR.101; 49.RR.43.

Stites's body was autopsied the next day by Dr. Roberto Bayardo. 48.RR.111. He observed a large mark across Stites's neck that matched the pattern of her belt. 48.RR.119–20, 136–37. There were bruises on Stites's arms consistent with forcible restraint, bruises on her head consistent with the knuckles of a fist, and bruises on her left shoulder and abdomen consistent with an over-the-shoulder seat belt. 48.RR.115–18. Based on physical changes in the body, Dr. Bayardo estimated Stites's time of death to be 3:00 a.m., give or take four hours. 48.RR.113–14.

Dr. Bayardo also took vaginal swabs, in addition to oral and rectal swabs. 48.RR.121–23. He too observed intact sperm from a vaginal swab, which he stated indicated "quite recent[]" seminal deposit. 48.RR.121–22. There were also injuries to Stites's anus, including dilation and lacerations. 48.RR.126. These were consistent with penile penetration inflicted at or near the time of Stites's death—peri-mortem. 48.RR.126–27. And, Dr. Bayardo, via microscopic analysis, thought he

10

saw sperm heads from a rectal swab, though he acknowledged that chemical testing was negative for semen from this swab. 48.RR.123–24. But, he noted however, that sperm break down quicker in the rectal cavity than in the vaginal cavity, so the fragmented sperm further indicated recent seminal deposit. 48.RR.125.

Thereafter, DPS personnel conducted DNA testing on the vaginal, rectal, and breast swabs, and the results indicated that the foreign DNA came from a single source. 49.RR.95–113. They also "mapped" Stites's panties, which showed little movement after semen was deposited in her vaginal cavity. 44.RR.190–91; 55.RR.40. This, too, demonstrated seminal deposit just before her murder. 55.RR.41.

For approximately a year, law enforcement—state, county, and municipal—searched for Stites's killer to no avail. They interviewed hundreds and obtained biological samples from twenty-eight males; none matched the foreign DNA in and on Stites. 46.RR.111–12; 49.RR.114–19. And none mentioned Appellant associating with Stites. 46.RR.112.

Appellant became a suspect in Stites's murder after he was arrested for kidnapping, beating, and attempting to rape and murder another

11

nineteen-year-old woman, Linda Schlueter. 46.RR.122.[9] Schlueter was abducted by Appellant approximately six months after Stites's murder, near both the route Stites typically took to work and the time she disappeared—3:00 a.m. 61.RR.10, 37–47. Moreover, Appellant was regularly seen in this area by Bastrop police officers in the early morning hours, and his home was close to where both Stites's and Schlueter's vehicles were abandoned. 50.RR.70–73, 80, 95–96. Further, Appellant's height—6'2"—aligned with the angle of the driver's seat. 49.RR.43.

Given these similarities, law enforcement inquired with DPS if they had Appellant's DNA profile; they did because Appellant had raped his mildly intellectually disabled girlfriend, Caroline Rivas (this was pre-CODIS). 46.RR.122–23.[10] Appellant's DNA profile was compared to the foreign DNA inside and on Stites's body and the two were consistent. 50.RR.104. Appellant was then questioned and he denied knowing Stites. 48.RR.82–83. Additional biological samples were taken from Appellant pursuant to a search warrant. 48.RR.18, 86–92.

---

[9] The specific facts of Schluter's abduction, assault, and attempted rape and murder was not revealed to the jury until the punishment phase of trial.

[10] Again, the underlying facts of Rivas's physical- and sexual-abuse was not provided to the jury until the punishment phase of trial.

12

More DNA testing was performed by DPS and a private laboratory on the new samples from Appellant and those taken from Stites's body. 49.RR.118–19; 50.RR.120–36, 140; 49.RR.127; 51.RR.33–34. The results were conclusive—Appellant could not be excluded as the foreign DNA contributor but 99% of the world's population could be, and one would only expect to see the foreign DNA profile in one person in anywhere from 24 to 130 billion people. 49.RR.118, 122; 50.RR.144–45; 51.RR.80. But, just to be sure, samples were taken from Appellant's father and three of his brothers, and they were ruled out as contributors too. 49.RR.123–25

Appellant's trial counsel attempted to counter this damning evidence with a two-pronged attack—they tried to blame someone else for the murder, and they argued that Appellant and Stites were engaged in a clandestine, but consensual sexual relationship.

To prove the former, Appellant's DNA expert testified that a hair found on Stites's back did not match any of the samples gathered by law enforcement, and a couple of witnesses testified they saw a white truck with three men in it near the area where Stites's body was recovered. 51.RR.107–08, 124–25; 54.RR.50–52. The latter witnesses' testimony was significantly impeached. 51.RR.115, 119, 128–29.

13

Trial counsel also suggested that Fennell was the murderer. Law enforcement interviewed Fennell several times and collected biological samples from him, but they never searched his apartment. 45.RR.110–12; 46.RR.62. Fennell was eventually cleared after law enforcement investigated, and ruled impossible, Fennell's ability to travel to Bastrop, murder Stites, and return home for Carol's phone call within the known timeframes, and without any sort of transportation. 46.RR.127.

Further still, trial counsel cast suspicion on David Lawhon, a Bastrop resident who murdered another woman, Mary Ann Arldt, two weeks after Stites's death. 46.RR.158. They called several witnesses that testified about a connection between Stites and Lawhon, including one who said Lawhon had confessed to killing Stites. 52.RR.29–31, 89. They were all greatly impeached—the confession witness actually told police someone other than Lawhon had confessed to Stites's murder, Stites's good friends testified in rebuttal that Stites never dated Lawhon, and Lawhon's ex-wife testified that nothing unusual occurred around the time of Stites's murder, which was different than when Lawhon murdered Ardlt. 52.RR.93; 54.RR.130, 138, 141–43.

As to the secret-relationship defense, one witness testified that she saw Stites and Appellant talking at the grocery store, and another said Stites came by Appellant's house looking for him. 51.RR.136; 53.RR.92. These were not credible accounts, however, as Appellant's family were frequent guests at the first witness's bar, and the second witness initially said "Stephanie," not "Stacey," was looking for Appellant, and she did not identify Stites when shown her driver's license photo. 51.RR.138–39; 53.RR.92–93. The jury found Appellant guilty of two counts of capital murder. *See also Reed IV*, 271 S.W.3d at 702–12 (providing an extensive recitation of the facts from Appellant's trial).

## SUMMARY OF THE ARGUMENT

The trial court did not abuse its discretion in denying Appellant's Chapter 64 motion. Initially, Appellant's Chapter 64 motion suffered from a lack of specificity and his litigation tactics added to the motion's ambiguity creating confusion that continues on appeal. Because of this confusion, Appellant did not clearly explain to the trial court how he met all of Chapter 64's prerequisites to obtain testing. A trial court, however, does not err in denying relief when a movant fails to clearly articulate compliance with *all* the requirements for the relief sought.

15

Next, the record amply supports the trial court's finding that Appellant did not meet *his* burden of production and persuasion that his Chapter 64 motion was not made to unreasonably delay the execution of his sentence or the administration of justice. The record is replete with Appellant's dilatory conduct. Indeed, Appellant, even today, is attempting to add evidence not before the trial court to seemingly justify his laggard conduct in seeking DNA testing. Not only is this impermissible, it does not show error in the trial court's decision.

Moreover, Appellant failed to prove that the evidence he seeks to test is or contains biological material. Appellant's own witnesses conceded that they could not categorically *prove* that the items Appellant sought to test contained biological material; they merely hypothesized DNA presence by speculating as to the facts of the crime. Guesses, however, are not evidence.

Further, with respect to the items in the possession of the Bastrop District Clerk, Appellant failed to prove a sufficient chain of custody. In arguing otherwise, Appellant ignores that the statutory chain-of-custody definition includes the phrases "tampered with" or "altered in any material respect." Appellant's argument and evidence about the ubiquity

of "touch" DNA, combined with the undisputed testimony that these items have been handled by numerous individuals without gloves, prove that such items has been "tampered with" or "altered in any material respect."

Finally, the trial court did not err in finding that Appellant would have been convicted despite having exculpatory results on the items he wishes to test. Appellant attempts to define "exculpatory" in such a way that DNA testing would always have to be ordered, a proposition recently rejected by this Court. And Appellant's primary basis of argument focuses on post-trial developments, which is another issue that the Court has rejected not long ago. Because the trial court's ruling was correct and because Appellant fails to demonstrate reversible error, the trial court's decision should be affirmed.

## ARGUMENT

### I.  The standards for DNA testing and appellate review.

Chapter 64 of the Texas Code of Criminal Procedure permits a "convicted person" to move for "forensic DNA testing of evidence containing biological material." Tex. Code Crim. Proc. art. 64.01(a–1). The evidence must have been "secured in relation to the offense that is the basis of the challenged conviction and was in possession of the state

17

during the trial," and was either not previously tested or, was tested but newer techniques could provide "more accurate and probative" results. Tex. Code Crim. Proc. art. 64.01(b). The convicting court may order testing, but only if (1) the evidence "still exits and is in a condition making DNA testing possible;" (2) the evidence "has been subjected to a chain of custody sufficient to establish it has not been substituted, tampered with, replaced, or altered in any material respect;" and (3) "identity was or is an issue in the case." Tex. Code Crim. Proc. art. 64.03(a)(1). Further, the convicted person must show by a preponderance of the evidence that he or she "would not have been convicted if exculpatory results had been obtained through DNA testing," and that "the request for proposed DNA testing is not made to unreasonably delay the execution of sentence or administration of justice." Tex. Code Crim. Proc. art. 64.03(a)(2).

On appeal, a trial court's decision regarding DNA testing is reviewed using a bifurcated standard. *Rivera v. State*, 89 S.W.3d 55, 59 (Tex. Crim. App. 2002). Almost total deference is afforded "a trial court's determination of issues of historical fact and application-of-law-to-fact issues that turn on credibility and demeanor." *Id.* All "other application of law-to-fact issues" are considered de novo. *Id.*

18

## II. Appellant's motion lacked the required specificity necessary to prove compliance with Chapter 64's requirements.

Article 64.01 provides preliminary requirements that must be satisfied for each item a convicted person seeks to test. Tex. Code Crim. Proc. art. 64.01(a)–(b). An "item" is not the entirety of a physical object, however, but specific, identifiable portions of the object which are or contain "biological material." *See Routier v. State*, 273 S.W.3d 241, 248 (Tex. Crim. App. 2008). "Biological material" is, in turn, defined by statute. Tex. Code Crim. Proc. art. 64.01(a)(1)–(2). Thus, a convicted person is required to specify the locations that he or she seeks to test of an item that is not per se biological material.

Then, the convicted person must specify whether each item, down to the specific location, has been previously tested. Tex. Code Crim. Proc. art. 64.01(b)(1)–(2). For those items that have not, there is no further burden under Article 64.01, but for those items that have, the convicted person must prove that "newer testing techniques" would likely provide "more accurate and probative" results than those obtained from the prior tests. Tex. Code Crim. Proc. art. 64.01(b)(1)–(2).

Appellant, in his Chapter 64 motion, sought to test a minimum of thirty-three items (some singularly listed items were actually multiple items; for example, "[c]arbon copies of *checks*"). 2.CR(DNA).115–17 (emphasis added). But, Despite this large testing request, Appellant attempted to satisfy Article 64.01 by stating, simply, that there were some "items that have never been subjected to DNA testing" while other items were "tested in 1998 [but] can also be subjected to . . . considerably more advanced and sensitive DNA techniques." 2.CR(DNA).91–92. In this, Appellant failed to demonstrate which items had been tested and which had not, he did not specify the regions to be tested on items that were not per se biological material, and he did not specify the DNA testing techniques that would provide more accurate *and* probative results on those items already tested.

Moreover, it was unclear exactly what Appellant sought to test. Appellant referred to an attachment accompanying his Chapter 64 motion as the "complete list of evidence" he wanted tested. 2.CR(DNA).115–17. However, he mentioned items not found in this "complete list" in the body of his Chapter 64 motion; for example, he asked to test items related to the extraneous offenses used at punishment

20

in his Chapter 64 motion but these items were not in the "complete list." *Compare* 2.CR(DNA).77, *with* 2.CR(DNA).115–17.

Only months later did Appellant discuss the various types of DNA testing currently available in his expert's, Deanna Lankford's, affidavit. 3.CR(DNA).245–47. But, even then, Appellant only explained that such DNA testing *might* be helpful. For example, Appellant discussed the possibility of using mitochondrial testing, though he did not discuss its suitability with respect to any particular item. 3.CR(DNA).247. Rather, he established that mitochondrial testing is a "newer . . . technique," but he did not discuss whether it was likely to result in more accurate *and* probative results, he still did not specify which items had been tested and which had not, nor did he specify the locales to be tested on each item.

And, with this affidavit came more ambiguity about what, exactly, Appellant wanted to test. The expert mentioned several items to possibly be tested. 3.CR(DNA).250–53.[11] But some of these items were then-being DNA tested pursuant to an agreement of the parties. *Compare*

---

[11] Belt, blue pants, white t-shirt, condom, hairs, nametag, fingerprints, napkin, pen, checks, and biological samples from Stites's body

2.CR(DNA).144–48, *with* 3.CR(DNA).250–53.[12]  And several items mentioned in the Chapter 64 motion and attachment were not discussed by the expert.

Then, at the hearing, Appellant introduced more confusion about what he wanted to test (though, it clarified his true intent—unreasonable delay).  Appellant's first witness, John Paolucci, discussed testing a plethora of items.  2.RR(DNA).30–53.  For the first time ever, Appellant specified regions to be tested on several items included in his Chapter 64 motion.  2.RR(DNA).30–39, 41.[13]  Appellant also requested testing on items he had never previously mentioned either in his Chapter 64 motion on in his expert's affidavit with specificity.  2.RR(DNA).34–37, 39, 41–42, 44, 46, 50, 53–55.[14]  Still yet, Appellant asked for preliminary testing on items he never before listed—with one exception—to determine if they

---

[12]  Vaginal, rectal, and breast swabs; four specific hairs; and a cutting from the panties.

[13]  Blue pants (cuffs, waistband, button opening, and button); panties (waistband); bra (clasp); and a white t-shirt (collar).

[14]  Socks (heel and cuff); left shoe (heel and laces); right shoe (heel and laces); HEB-branded shirt (collar, cuffs, armpits); pieces of a green cup; brown planner; beer cans (lip); hair from brown planner; victim's hand bags; extracts from condom; and extracts from beer cans.

contained biological material. 2.RR(DNA).45–47, 49–50, 52.[15] And then Appellant, maybe, abandoned (or not) testing on several other items, some previously listed and some not. 2.RR(DNA).40, 42, 44–45.[16]

Appellant's second witness, Deanna Lankford, like Paolucci, discussed potentially testing a number of items. 3.RR(DNA).106–24. She, too, discussed testing certain regions of items that Appellant had discussed only at the item-level in his Chapter 64 motion, though she specified more areas than Paolucci did. 3.RR(DNA).106–10.[17] And she, too, mentioned items not contained in Appellant's Chapter 64 motion or specific in her prior affidavit, though she did not mention preliminary tests on some of these items like Paolucci did and she, again, mentioned additional areas to be tested on certain items. 3.RR(DNA).110–11, 115–17.[18] Lankford also testified about items for which she only suggested

---

[15] White flakes; two tape lifts from Stites; paper napkin (requested in Chapter 64 motion); green blanket; driver's seat tape lifts; and white paper sheet.

[16] Back brace (not previously requested); bridal receipt (previously requested); knee brace (not previously requested); and maybe automatic teller and Walmart receipts ("skipping over paper items," which were previously requested).

[17] Blue pants (crotch, zipper, button, waistband, and cuffs); and panties (crotch and waistband).

[18] Socks; left shoe; right shoe; HEB-branded shirt; pieces of a green cup; brown planner; white flakes; two tape lifts from Stites; beer cans (lip and crush ridges); victim's hand bags; and unspecified extracts.

preliminary testing to determine if biological material existed. 3.RR.(DNA).119.[19]    Finally, there were many items that Paolucci discussed that Lankford did not, or at least with specificity.[20]  The State objected to the items not specified in Appellant's Chapter 64 motion. *E.g.*, 2.RR(DNA).31.

On appeal, it is still not entirely clear what Appellant wants to test. Does Appellant no longer want to test specific areas of items that only Lankford mentioned but Paolucci did not?[21]  Does Appellant wish to forego testing on items mentioned by Paolucci or Lankford but not discussed on appeal?[22] Does Appellant abandon those items listed in his motion but not discussed at the hearing or on appeal?[23]

On top of that ambiguity, Appellant still has not specified which items have been tested and which have not and what type of testing he

---

[19]    White paper sheet; and driver's side tape lifts.

[20]    Back brace; bridal receipt; knee brace; green blanket; hair from brown planner; extracts from condom; and extracts from beer cans.

[21]    Blue pants (crotch and zipper); and panties (crotch).

[22]    Back brace; bridal receipt; knee brace; white flakes; tape lifts from Stites; paper napkin; green blanket; driver's seat tape lifts; white paper sheet; and biological samples from Stites's body.

[23]    Carbon copies of checks; gas emergency book; automated teller receipt; Walmart receipt; business card; plastic bag; blue rope; brown rope; piece of a shirt; and piece of a knife.

would perform on each previously tested item. As Lankford admitted at the hearing, for example, mitochondrial testing cannot prove identity. 3.RR(DNA).162. Are mitochondrial results, therefore, more probative than the results of testing previously run on the beer cans in 2001? Because Appellant has never provided the specificity needed to make such determinations, the answers to such questions are not found in this record.[24]

Appellant's hodgepodge testing request, ever changing and still not clear, is reason to affirm the trial court's denial of his Chapter 64 motion. In *Dinkins v. State*, like here, the convicted person requested testing of certain items in his Chapter 64 motion and then requested more items at the hearing on the motion. 84 S.W.3d 639, 640–41 (Tex. Crim. App. 2002). This Court affirmed the denial of Dinkins's Chapter 64 motion, in part, because the Court was "not entirely clear as to what evidence [Dinkins] wants tested." *Id.* at 642. This was because Dinkins "never

---

[24] To prevent the problem that Appellant created here—a moving target of items that he wished to test—the Court should adopt the same rule utilized in motions for new trial. Namely, a new-trial movant cannot amend his motion for new trial at a hearing on the same if the State objects. *See Clarke v. State*, 270 S.W.3d 573, 580–81 (Tex. Crim. App. 2008). The State, in Appellant's case, repeatedly objected to testing of items raised for the first time at the hearing and, so, the trial court's decision should be affirmed as to those dilatorily raised items.

explained the discrepancy between his original motion and [his expert's] report." *Id.* The "discrepancy" in *Dinkins* pales in comparison with the one present here and, as such, the Court should affirm the decision denying Appellant DNA testing.

Additionally, like in *Dinkins*, Appellant only made "general statements about the type of DNA testing that was available at the time of . . . trial [and] he failed to specifically address the issue of whether at the time of . . . trial the type of DNA testing necessary to test [those items already tested] was capable of providing probative results." *Id.* at 642. Swabs from Stites's vaginal and rectal cavities and her breasts, a stain from the crotch of her panties, stains from her pants, a stain from her back brace, several hairs, and swabs from the beer cans were all tested at the time of trial, 49.RR.92–93; 54.RR.44; *Reed IV*, 271 S.W.3d at 713–14, and the beer cans were re-tested as part of Appellant's second state habeas proceeding, *Reed IV*, 271 S.W.3d at 738–39, but Appellant has not provided specific analysis with any of these previously tested items, just the "general statements" that were found to be insufficient in *Dinkins*. Thus, the Court should affirm trial court's ruling on these items (which Appellant may or may not still want to test).

26

**III. The trial court was correct in finding that Appellant did not meet his burden of proving that he would not have been convicted with exculpatory test results.**

Appellant attacks the trial court's decision that he did not prove, by a preponderance of the evidence, that he would not have been convicted presuming exculpatory results on the items he sought to test. Appellant's Br. 41–60. Appellant's arguments fall into two broad categories.

Appellant's first and primary contention is that the trial court should have considered post-trial evidence in making its Article 64.03(a)(2)(A) finding. Appellant's Br. 44–52. Appellant has provided the Court with the should-have-been-considered post-trial evidence in two appendix volumes. App'x 5, 21–22. In a footnote, Appellant argues that this Court may consider the appended evidence "under the doctrine of judicial notice." Appellant's Br. 48 n.22.

Second, Appellant asserts that the trial court used an impermissibly narrow construction of the term "exculpatory" in making its probabilistic determination of whether Appellant would have been found guilty armed with the results of new testing. Appellant's Br. 53–60. Instead, Appellant argues that the appropriate exculpatory presumption under Article 64.03(a)(2)(A) is that the DNA of a third party,

known offender would be found on the items the convicted person seeks to test. Appellant's Br. 52–60. Appellant's complaints are without merit and the trial court's decision should be upheld.

## A. Appellant's lack of specificity worked to his detriment.

As noted above, a convicted person must prove by a preponderance of the evidence that he or she would not have been convicted assuming exculpatory results on the items sought to be tested. Tex. Code Crim. Proc. art. 64.03(a)(2)(A). It is clear that the convicted person bears the evidentiary burden on this point. *See, e.g., Wilson v. State*, 185 S.W.3d 481, 484 (Tex. Crim. App. 2006). Moreover, courts cannot "consider post-trial evidence when deciding" this issue. *Holberg v. State*, 425 S.W.3d 282, 285 (Tex. Crim. App. 2014).

Initially, Appellant's lack of clarity hampers his ability to show that the trial court erred. He faults the trial court's oral ruling for containing "*no* findings of fact [and] *no* relevant evidence," Appellant's Br. 41, but Appellant's lack of specificity as to which items to test and how each item fits into the larger evidentiary picture looms over his case even today. As demonstrated above, *see supra* Argument II, the State is still not sure what Appellant wants to test. It is hard to fault the trial court's ruling

that Appellant failed in *his* burden of proof when Appellant did not even clearly articulate which items the trial court was supposed to apply the presumed-exculpatory-result standard. Because he did not make clear precisely what items were to factor into the Article 64.03(a)(2)(A) test, Appellant cannot demonstrate error in the trial court's ruling.

**B. The trial court properly eschewed Appellant's request to consider post-trial evidence and such evidence is not properly before this Court.**

As to Appellant's failure-to-consider-post-trial-evidence complaint, *Holberg* demonstrates that Appellant is clearly wrong and that the trial court was clearly right to not consider such evidence. In rejecting the same type of tactic Appellant uses, the Court held:

> Thus, despite the influx of newly asserted post-trial factual developments that the appellant calls upon us to consider, our review is limited to discerning whether, and to what extent, exculpatory results from . . . DNA testing would alter the landscape if added to the mix of evidence that was available at the time of trial.

*Holberg*, 425 S.W.3d at 285. *Holberg* is absolutely dispositive of Appellant's point of error and the trial court did not err by failing to consider Appellant's post-trial evidence.

In addition, much of the evidence Appellant now relies upon he failed to provide to the trial court despite the fact Appellant's request for

29

a live hearing was granted, something which the trial court was not required to do. *See Whitaker v. State*, 160 S.W.3d 5, 8–9 (Tex. Crim. App. 2004) ("Nothing in Chapter 64 requires the trial court to conduct a hearing, regardless of whether the State attaches affidavits to its response"). Thus, Appellant has forfeited his right for this evidence to be considered, independent of *Holberg*, because he did not introduce it at the evidentiary hearing on his Chapter 64 motion. *Cf. Mays v. State*, 285 S.W.3d 884, 889 (Tex. Crim. App. 2009) ("In order to preserve error regarding a trial court's decision to exclude evidence, the complaining party must . . . make[] an 'offer of proof' which sets forth the substance of the proffered evidence."). Thus, the trial court did not err in its Article 64.03(a)(2)(A) ruling with evidence that Appellant did not even attempt to introduce at the Chapter 64 hearing.

Additionally, this Court should not consider the appended, post-trial evidence, separate from *Holberg* and Appellant's forfeiture of the issue, because "[g]eneral considerations governing appellate review apply here." *Whitehead v. State*, 130 S.W.3d 866, 872 (Tex. Crim. App. 2004). First, "[a]n appellate court may not consider factual assertions that are outside the record, and a party cannot circumvent this prohibition by

30

submitting an affidavit for the first time on appeal." *Id.* (footnotes omitted). Second, "an appellate court's review of the record itself is generally limited to the evidence before the trial court at the time of the trial court's ruling." *Id.* (footnote omitted). Both considerations apply here and both counsel against Appellant's attempt to unmoor the trial court's ruling from the record before it.

Appellant's pursuit to thwart these well-worn rules finds no home in *Routier*, despite Appellant's argument to the contrary. Rather, *Routier* stands for the unremarkable proposition that trial courts, in engaging in probabilistic determinations about how either new or additional evidence would have affected *a trial* if such evidence had been presented *at trial*, must, necessarily, consider the facts of *the trial*. *See Routier*, 273 S.W.3d at 244 n.2 ("However, in its order denying appellant's motion for post-conviction DNA testing, the convicting court *did* indicate it had considered 'the evidence adduced at trial[.]'" (alteration in original)). Nothing in *Routier* remotely stands for the proposition that, in making an Article 64.03(a)(2)(A) determination, that post-trial evidence can be considered. Even if it did, *Holberg*'s more recent vintage and its express, directly-on-point holding means *Holberg* controls. Thus, Appellant's

31

attack on the trial court's ruling for not having considered post-trial evidence fails.

## C. The trial court applied the proper exculpatory-result presumption.

As to Appellant's incorrect-exculpatory-presumption argument, that, too, fails. In one of the Court's most recent Chapter 64 opinions, the Court defined "'exculpatory results' to mean *only* results 'excluding [the convicted person] as the donor of this material.'" *State v. Swearingen*, 424 S.W.3d 32, 38 (Tex. Crim. App. 2014) (alteration in original) (emphasis added) (quoting *Blacklock v. State*, 235 S.W.3d 231, 232 (Tex. Crim. App. 2007)). While Appellant suggests that cases like *Blacklock* and *Esparza v. State*, 282 S.W.3d 913 (Tex. Crim. App. 2009), support his third-party-presumption argument, they actually undermine it.

In *Blacklock*, the Chapter 64 movant had been convicted of aggravated robbery and aggravated sexual assault. 235 S.W.3d at 232. He sought to test vaginal smears from the victim and semen left on the victim's pants and panties during the attack. *Id.* This Court reversed a court of appeals, noting that the record established that the "victim's *lone* attacker is the donor of the material for which [the] appellant seeks DNA testing." *Id.* (emphasis added). Thus, if DNA testing "exclud[ed] [the]

32

appellant as the donor of th[e] [semen]," it would have establish his innocence. *Id.* This firmly stands for the proposition that trial courts are only to presume that the results of testing would "exclud[e]" the convicted person, not include someone else.

In *Esparza*, the underlying crime was an aggravated sexual assault. 282 S.W.3d at 914–17. The convicted person sought to test a rape kit, including vaginal and oral swabs and a fabric cutting. *Id.* at 918. In reversing the court of appeals, this Court held that it was improper for the court of appeals to assume "the presence of a third party's DNA" in deciding whether the convicted person would not have been convicted presuming exculpatory results. *Id.* at 921. Instead, because it was undisputed that the victim's "attacker deposited semen or seminal fluid inside [the victim] during the assault," *id.*, a convicted person in a "sexual assault case[]" can prove innocence if the DNA from a rape kit is presumed to not to be his. *Id.* at 922. *Esparza*, which relied heavily on *Blacklock*, supports the proposition that the proper exculpatory result is simply that the convicted person's DNA would not be found on the items he or she desired to test. *See also Ex parte Gutierrez*, 337 S.W.3d 883, 899 (Tex. Crim. App. 2011) ("The burden

33

under Article 64.03(a)(2)(A) is met if the record shows that exculpatory DNA test results, *excluding the defendant as the donor of the material*, would establish, by a preponderance of the evidence, that the defendant would not have been convicted." (emphasis added)).

Moreover, it is clear that the trial court was prohibited from assuming that any item would bear the DNA of a known offender. This was recently rejected in *Swearingen*, where the Court stated:

> A requirement to assume that the results of testing were not only from someone other than the convicted person but that the other person was a repeat offender (or as the appellee argued before this court, a repeat offender with a similar modus operandi), makes it hard to imagine a case in which we would not grant DNA testing. Such compelling DNA results would certainly overcome any mountain of inculpatory evidence. We believe that had the legislature meant to so drastically lower the barrier for Chapter 64 testing, they would have said so explicitly. The statute requires only that the results be run through CODIS. It does not set a standard for exculpatory results.

424 S.W.3d at 39. As such, the trial court was correct in not applying the presumption of a CODIS-matched DNA result in determining whether Appellant would have been convicted when factoring in exculpatory test results.

Applying the proper exculpatory presumption—that Appellant's DNA would not be found on a particular item—it is clear that the trial

court did not err. However, this Court should find that Appellant has forfeited the issue on appeal, at least as to how an exculpatory result on any particular item would factor into the trial evidentiary mix. While attempting to demonstrate error in *how* the trial court came to the conclusion that Appellant did not prove that he would have likely been convicted presuming exculpatory results, he does not actually discuss *why* the trial court's decision is erroneous with respect to any particular item he (maybe) seeks to test. Put another way, Appellant does not describe how the absence of his DNA on each item he (maybe) seeks to test would prove that he would likely not have been convicted considering only the evidence at trial.

Appellant's primary substantive argument (instead of process-based argument) in challenging the adverse Article 64.03(a)(2)(A) finding is this—had the trial court presumed "an alternative known suspect . . . on the evidence [Appellant] seeks to test (i.e., the belt used to strangle Ms. Stites, the victim's name tag, her clothing, fingernail scrapings, and other evidence very likely handled by her killer)," it could only have concluded that Appellant would not have been found guilty. Appellant's Br. 57–58. But this cursory briefing is hardly an item-by-

35

item analysis of how each item fits into the evidence at trial. As such, the State respectfully requests that the Court find this issue forfeited on appeal for inadequate briefing. *See Lucio v. State*, 351 S.W.3d 878, 896–97 (Tex. Crim. App. 2011) (finding that the failure to provide record citations in relation to the applicable legal authority was inadequate briefing). Nevertheless, the State alternatively addresses the evidence Appellant at least mentions in his brief to demonstrate the correctness of the trial court's Article 64.03(a)(2)(A) finding.

### D. Appellant failed to prove by a preponderance of the evidence that he would not have been convicted armed with exculpatory test results.

#### 1. Items found on Stites

Concerning the pants, the jury heard that there were two saliva stains on them, which had DQ Alpha alleles 1.2 and 4. 49.RR.112. The jury knew that Stites had DQ Alpha alleles of 1.2 and 4, 49.RR.101, and that Appellant's DQ Alpha alleles were 1.2 and 3, 49.RR.118. Consequently, the jury knew Appellant's DNA was not found on Stites's pants and they nevertheless convicted him. Thus, he does not prove by a preponderance that the jury would not have convicted him given that they already knew his DNA was not found on Stites's pants.

36

As to the panties, the jury learned that DQ Alpha alleles of 1.2 and 3 and D1S80 alleles of 22 and 24 were discovered in them. 49.RR.110. The jury knew Appellant's DQ Alpha alleles were 1.2 and 3 and his D1S80 alleles were 22 and 24. 49.RR.118–19. Thus, Appellant matched the male fraction found in the panties at these alleles. If Appellant was not found in the panties, however, the jury would still have known that his DNA was on Stites's breasts, 49.RR.111, in her vaginal cavity, 49.RR.104, and in her rectal cavity, 49.RR.107. Thus, Appellant does not demonstrate that he would not have been convicted had his DNA been "only" in and on Stites's body, instead of in her panties.

Similarly, had the jury known that Appellant's DNA was not on the socks, shoes, and bra, they still would have convicted Appellant. Contrary to Appellant's witnesses' opinions at the Chapter 64 hearing, the jury heard testimony that there was no evidence to indicate Stites had been dragged to her resting place. 44.RR.153. Accordingly, the jury's result would not have been any different had they known Appellant's DNA was not on these items of clothing, but "only" inside and on Stites's body.

The lack of Appellant's DNA on Stites's nametag also would not prove he would not have been convicted. The jury knew the nametag was tested for fingerprints, 47.RR.30, but that Appellant's fingerprints were not on it, 47.RR.42. As such, the jury knew that Appellant was not linked with the item, yet still they convicted him. Again, Appellant does not show that if his DNA was not on this item that he would have avoided conviction.

Finally, regarding the hand bags, there was testimony that no evidence was collected from Stites's fingernails because "[t]hey were so short that it was impossible to even try to clip anything, much less try to scrape anything from underneath them." 44.RR.163. And there was no testimony that Stites fought her attacker. As such, the jury would not blink if Appellant's DNA was not found underneath Stites's nails, which, according to Appellant, could possibly be found in the bags around her hands. *See Ex parte Gutierrez*, 337 S.W.3d at 900–01 (finding no reasonable probability of not being convicted because there was "no evidence to suggest that the [victim] was able to hit or scratch her murderers with her fingernails as they attacked her").

### 2. Items found near Stites

Jurors heard that Stites borrowed the white t-shirt from Fennell. 45.RR.108. And jurors heard that both the white t-shirt and the belt fragment were subjected to fingerprint analysis but that Appellant's fingerprints were on neither item. 47.RR.43–44, 49. Again, the jury's decision would not have been affected by not finding Appellant's DNA on either item.

Regarding the beer cans and their extracts, the jury heard the cans were collected off the side of the road, 45.RR.25, and that it was not uncommon to find such items on country roads, 45.RR.45. Assuming that Appellant's DNA is not on these items does not prove by a preponderance that he would have not been convicted.

### 3. Item discovered by a citizen

At trial, all that was revealed about the condom was that "someone" turned it into the sheriff's office. 52.RR.134–35. The condom, however, "appeared to be old and cracked and worn out . . . hav[ing] been out in the woods for some time," 52.RR.142, and there was no information regarding when the condom was given to authorities, 52.RR.143. Trial counsel mentioned the condom in closing, saying it was found "[n]ot right there, down the way, but in the general area." 56.RR.110. That a condom,

with no seeming connection to the crime, would not have Appellant's DNA on it does not prove by a preponderance of the evidence that he would not have been convicted.

### 4. Items found in or near the truck

Fennell testified that his truck was "just in disarray" because he had "thrown [his] baseball stuff" in the truck the night before Stites's murder, a practice which he called "normal." 45.RR.98. Fennell was a little league baseball coach and had coached his team and transported a little leaguer in his truck the evening before Stites's murder. 45.RR.78–79, 97. Thus, the jury would not be surprised to not find Appellant's DNA but someone else's on any of the items found in or near Fennell's truck.

Moreover, the jury heard that several items found inside or near the truck—a gas emergency book, various receipts, lighter, Big Red gum pack, paper napkin, pen—and the truck itself were examined for fingerprints, 47.RR.32–35, 39–42, but that Appellant's fingerprints were not discovered on the items, 47.RR.43, and that he did not match fingerprints that were developed on the truck, 47.RR.28. The jury's decision would not be affected had they had also known that Appellant's DNA was not in the truck. And, the jury's verdict would not be any

40

different if Appellant's DNA was not found on any of these items but still found on and inside Stites's physically- and sexually-abused body. *Cf. Bell v. State*, 90 S.W.3d 301, 306 (Tex. Crim. App. 2002) ("The presence of another person's DNA at the crime scene will not, without more, constitute affirmative evidence of [the convicted person's] innocence.").

### 5. Items presently in the possession of the Bastrop District Clerk

As explained more fully below, *see infra* Argument V, many of the items Appellant (maybe) wants to test have been handled by numerous individuals—attorneys, court personnel, and jurors—without gloves at Appellant's capital murder trial and they were stored commingled and without protective packaging in the Bastrop District Clerk's Office.[25] 4.RR(DNA).178–183, 194, 199–200. Assuming for the sake of argument that Appellant is right that touching these items ungloved would leave the handler's DNA behind, finding another person's DNA on these items would not demonstrate by a preponderance of the evidence that Appellant would not have been convicted. *See Swearingen*, 424 S.W.3d

---

[25] Assuming that Appellant only wants to test what is listed in his brief, this would include: blue pants; panties; socks; shoes; bra; nametag; white t-shirt; belt; earring; HEB-branded shirt; knife with metal cover; pieces of a green cup; and brown planner.

at 38–39 ("Primarily, this is because the victim's having encountered another person would not factually exclude the [convicted person] from having killer her. There are many ways someone else's DNA could have ended up in the victim's fingernails. Such results would not require an inference that the [convicted person would [have] been acquitted.").

"In sum, granting DNA testing in this case would 'merely muddy the waters.'" *Ex parte Gutierrez*, 337 S.W.3d at 901. Because Appellant does no more than that, the Court should affirm the trial court's Article 64.03(a)(2)(A) decision.

## IV. The trial court's finding of unreasonable delay is amply supported by the record.

Appellant argues that the trial court's overall finding that he filed his Chapter 64 motion to unreasonably delay the execution of his sentence or the administration of justice is in error. Appellant's Br. 60–86. He asserts that Chapter 64 does not impose a filing deadline or "require a movant to explain why he did not raise a claim earlier." Appellant's Br. 63. Further, Appellant claims that Chapter 64 motions filed within a month of an execution setting are, presumptively, filed for the purpose of unreasonable delay but those filed before such a setting are not. Appellant's Br. 63–64. Because he falls into the latter camp, his

motion was not an unreasonable delay. He also alleges that each subsidiary fact finding is wrong. Appellant's Br. 65–86. Contrary to Appellant's arguments, the trial court's umbrella ruling and its underlying factual findings are all abundantly supported by the record.

A convicted person bears the burden of proving, by a preponderance of the evidence, that he or she does not seek DNA testing to unreasonably delay the execution of sentence or the administration of justice. Tex. Code Crim. Proc. art. 64.03(a)(2)(B). This Court has not elucidated the factors to be considered in determining unreasonable delay; however, Judge Hervey's concurrence in *State v. Patrick* provides some factors to consider:

> Last minute requests for DNA testing without regard to the promptness of the request, the proximity in time between the request and execution of sentence, or a determination as to when the convicted person could have previously requested DNA testing would pose a hindrance to the Legislative mandate of Chapter 64 opposing unreasonable delay.

86 S.W.3d 592, 598 (Tex. Crim. App. 2002) (Hervey, J., concurring). The State believes that additional factors here—the failure to provide time estimates, prior litigation history, and present litigation tactics—should also be considered holistically and a finding of unreasonable delay upheld unless entirely unsupported by the record.

43

This Court has previously indicated that such a determination "is an application-of-law-to-fact question and is therefore given de novo review." *Skinner v. State*, 122 S.W.3d 808, 813 (Tex. Crim. App. 2003). Nevertheless, the State believes the appropriate standard of review in this case is "almost total deference" because Appellant placed his credibility at issue—he averred, in his (belatedly) sworn Chapter 64 motion, that: (1) the motion was brought in good faith; (2) it was brought as soon as it appeared the federal habeas proceedings "were coming to a close;" (3) and he could not have brought it any sooner because of technological- and legislative-changes. 2.CR(DNA).100. At the hearing, the State introduced evidence, which was admitted without objection, contesting those (belatedly) sworn averments. Thus, the State challenged Appellant's credibility and the more favorable almost-total-deference standard should apply. *See Rivera*, 89 S.W.3d at 59. Regardless of the standard of review, "the trial court's finding regarding unreasonable delay is supported by the record" and should be affirmed. *Thacker v. State*, 177 S.W.3d 926, 927 (Tex. Crim. App. 2005).

**A.** **The timing, breadth, and ambiguity of Appellant's DNA testing request support the finding of unreasonable delay.**

Appellant has continuously and aggressively challenged his judgment of conviction since the day he was sentenced to death in 1998. *See supra* Statement of Facts I. Against this backdrop, the Legislature enacted Chapter 64 in 2001, Act of April 5, 2001, 77th Leg., R.S., ch. 2, § 2, 2001 Tex. Sess. Law Serv. Ch. 2 (codified at Tex. Code Crim. Proc. arts. 64.01–64.05), and the last amendment was in 2011, Act of June 17, 2011, 82nd Leg., R.S., ch. 366, § 1–4, 2011 Tex. Sess. Law Serv. Ch. 366 (codified at Tex. Code Crim. Proc. arts. 64.01, 64.035, 64.04). Appellant never sought DNA testing after it became statutorily available, that is, until he lost his federal habeas appeal in the Fifth Circuit. 2.CR(DNA).106–13. Even then, it was only an informal request. 2.CR(DNA).106–13. The State agreed to test some of the items Appellant requested. 2.CR(DNA).144–48.

In the interim, the State moved for an execution date. 1.CR(DNA).34–35. On the day the trial court first set Appellant's execution date, Appellant filed his Chapter 64 motion and asked for a significant number of items to be tested, including items beyond what

45

was in his informal request. 2.CR(DNA).77, 115–17. Months later he supplemented (or amended) that large request with more items. 3.CR(DNA).250–53. A month after that—at the Chapter 64 hearing—he added (or amended) his request with even more items. 2.RR(DNA).30–53, 106–24. *See also supra* Argument II. Given Appellant's Chapter 64 litigation, it was not improper for the trial court to find unreasonable delay.

### 1. Time between Appellant's request and his execution date

It is appropriate to consider the time between "proximity in time between the request and execution of sentence." *Patrick*, 86 S.W.3d at 598. Inherent in such a consideration is the nature of the request—a request to test a single item using one DNA testing technique a month away from an execution date will obviously be seen as more reasonable than requesting a large and nebulous amount of items using an unspecified variety of DNA testing techniques in that same time frame.

Here, at the hearing setting an execution date, the State sought a date six months out to accommodate the agreed-to DNA testing of three types of swabs, four hairs, and a fabric cutting. Appellant's Chapter 64 request dwarfed the agreed-to DNA testing, which was thought to need

46

about six months for completion. Despite the fact that the State provided a timeline for that testing, 1.RR(DNA).14, and despite the fact that *Appellant previously proposed to enter into a DNA-testing scheduling order*, 1.CR(DNA).48, Appellant now chastises the trial court for having considered his failure to provide an estimated timeline for DNA testing. Appellant's Br. 65–66. While Appellant is correct that Chapter 64 does not require that a convicted person propose an estimated completion date for DNA testing, Appellant's Br. 65, it also does not define unreasonable delay, *see* Tex. Code Crim. Proc. art. 64.03(a)(2)(B), meaning that it is not improper for a trial court to take into account the timing and breadth of the requested testing. Here, it was absolutely proper for the trial court to believe that Appellant's massive and ever-changing request, seemingly prompted by the loss in the Fifth Circuit and filed on the same day as the hearing on the State's motion to set an execution date, was intended to unreasonably delay the execution of sentence or administration of justice.

### 2. Promptness of the request and previous opportunities to request testing

It is also proper to consider the "promptness of the request . . . [and] when the convicted person could have previously requested DNA testing." *Patrick*, 86 S.W.3d at 598. Chapter 64 had been in existence

47

for more than thirteen years and its last amendment was effective almost three years before Appellant filed his Chapter 64 motion. Such a delay should be considered presumptively unreasonable. *See Thacker*, 177 S.W.3d at 927 ("Appellant *waited over four years* to file his motion, and that motion was filed less than a month before his scheduled execution." (emphasis added)).

Moreover, the evidence before the trial court showed that one of Appellant's attorneys, on behalf of another death row inmate, filed a Chapter 64 motion substantially similar and, in some places verbatim, to Appellant's a year-and-a-half before Appellant's filing. 7.RR(DNA).RX14. Notably, this filing contained an expert's affidavit and an affidavit from the convicted person whereas, in Appellant's case, these items did not come for months. *Compare* 7.RR(DNA).RX14, *with* 3.CR(DNA).233–34, 317–18. And the same attorney, on behalf of the same death row inmate, filed a second Chapter 64 motion two months before Appellant's. 9.RR(DNA).RX15. Thus, it was entirely appropriate to find that Appellant had the legal expertise necessary to file his Chapter 64 motion much sooner than he did.

Further, this Court held long ago that the pendency of federal habeas proceedings did not prevent a convicted person from seeking Chapter 64 relief on account of the "two-forums" rule. *See Thacker*, 177 S.W.3d at 927. As such, it was entirely appropriate for the trial court to find that Appellant's federal habeas proceeding was not an impediment to his seeking testing under Chapter 64.

To this, Appellant argues that the trial court did not take into account the State's "foot-dragging" and his prior request for DNA testing. Appellant's Br. 67–70. However, the evidence of the State's supposed dilatoriness was not before the trial court—Appellant relies on his attorney's affidavit filed in opposition to the State's motion to accelerate this appeal. Appellant's Br. 21–23. Thus, it cannot be a basis for undermining the trial court's decision and it should not be considered on appeal. *See Whitehead*, 130 S.W.3d at 872.

Further, Appellant's argument also ignores that requesting DNA testing in an almost twenty-year-old crime would naturally have attendant delay, especially when needing to locate and document evidence from four law enforcement agencies, a medical examiner's office, a crime lab, and a clerk's office in a case that had been closed for almost

sixteen years.  Even assuming that Appellant's argument can be considered on appeal, the "foot-dragging" did not prevent Appellant from filing a protective Chapter 64 motion which he could have withdrawn had it been rendered moot by an agreement.  *Cf. Pace v. DiGuglielmo*, 544 U.S. 408, 416 (2005) (noting that a state inmate may file a "'protective' petition" in federal court to ensure compliance with timeliness standards).  Accordingly, Appellant's latter-day blame shifting is no excuse for his more-than-a-decade-delayed filing.  And Appellant's last-minute attempt to shift blame for his dilatoriness to the State should be recognized by this Court and taken into account.  *See Rosales v. State*, 748 S.W.2d 451, 456 (Tex. Crim. App. 1987) (noting that, in the indigence-on-appeal context, the hiring of an appellate lawyer can be considered in deciding whether the appellant is indigent).

Appellant also appears to suggest that the State's requests for extensions of time in another proceeding somehow undermine the trial court's decision.  Appellant's Br. 16–17.  Neither the argument nor the evidence was provided to the trial court and should not be considered on appeal.  *See Whitehead*, 130 S.W.3d at 872.  But, even considering this forfeited issue, there was only one 10-day extension in the Fifth Circuit

and two 30-day extensions in the Supreme Court after Appellant informally requested DNA testing, assuming that is the appropriate request measure. An additional 70 days in two different proceedings pales in comparison with Appellant's thirteen- or almost-three-year delay following the enactment of Chapter 64 or its latest amendment.

As to his prior, non-Chapter 64 DNA testing motion, the trial court faulted him for failing to file despite availability under Chapter 64, 3.CR(DNA).344, and, as Appellant admits, his non-Chapter 64 DNA testing motion was filed before Chapter 64's enactment, Appellant's Br. 7. This demonstrates no error in the trial court's findings. Moreover, Appellant dubbed his Chapter 64 motion as his "first request for post-conviction DNA testing." 2.CR(DNA).100. He can hardly fault the trial court for not mentioning a motion he seemingly forgot about.

Appellant also argues that prior versions of Chapter 64 were "legal impediments" to his filing for DNA testing until the 2011 amendments defining "biological material." Appellant's Br. 70–76. If this were

51

actually true, it is news to Henry Skinner[26] and Larry Swearingen,[27] who filed Chapter 64 motions both before and after certain amendments to Chapter 64. Moreover, this Court confirmed that the amendments to term "biological material" did not result in the sea change Appellant suggests. *See Swearingen*, 424 S.W.3d at 37 ("The recent amendments have not fixed this problem in most cases. No part of the amendments addresses a method for determining the existence of biological material."). Assuming arguendo the truth of Appellant's impediment argument, however, it still does not explain why Appellant waited almost three years after the Legislature defined "biological material" to file his Chapter 64 motion. Appellant clearly was dilatory in his request for DNA testing and the trial court's finding of unreasonable delay should be upheld.

---

[26] *Skinner v. State*, No. AP-76675, 2012 WL 2343616 (Tex. Crim. App. June 20, 2012); *Skinner v. State*, 293 S.W.3d 196 (Tex. Crim. App. 2009); *Skinner v. State*, 122 S.W.3d 808 (Tex. Crim. App. 2003).

[27] *State v. Swearingen*, 424 S.W.3d 32 (Tex. Crim. App. 2014); *Swearingen v. State*, 303 S.W.3d 728 (Tex. Crim. App. 2010); *Swearingen v. State*, 189 S.W.3d 779 (Tex. Crim. App. 2006)

**B. Appellant's overall litigation history left little doubt that his Chapter 64 motion was filed for purposes of unreasonable delay**

It is also not error for a trial court to consider the entirety of a convicted person's litigation history to determine his present intent. Multiple courts, including this one, have found that Appellant has engaged in fragmented and dilatory litigation. *See* 10.RR(DNA).RX16, at 11 ("Moreover, [Appellant's] motion is untimely. . . . [Appellant] fails to provide this court with any explanation as to why he waited until [more than two years after filing his final federal habeas petition] . . . to request additional testing of evidence."); *id*. at 12 ("The same concerns this court has about [Appellant's] untimely motion for additional testing of evidence applies to his extraordinary delay in proffering Bayardo's affidavit."); 10.RR(DNA).RX17, at 17 n.17 ("[W]e find that even had the district court not considered Dr. Bayardo's affidavit, it would have acted within its discretion because the affidavit was untimely. [Appellant] has provided no persuasive reason for waiting to well over a decade to revisit Dr. Bayardo's testimony."); *Reed V*, 2009 WL 97260, at *1 (describing Appellant's as "[t]aking a piecemeal approach").

Moreover, Appellant, multiple times and as early as almost eight months before the trial court entered its findings, stated he was going to file additional postconviction litigation, but never did—at least not before he filed his notice of appeal—despite providing the trial court with a proposed filing deadline.[28]  1.CR(DNA).47; 1.RR(DNA).10 ("We will be filing within 30 days.").

Further, Appellant waited months to provide the trial court with an expert's affidavit or his own, despite a statutory requirement to submit the latter.  *See* Tex. Code Crim. Proc. art. 64.01(a–1).  This delay occurred despite evidence that Appellant's counsel knew of the personal-affidavit requirement a year-and-a-half earlier.  *Compare* 7.RR(DNA).RX14, *with* 3.CR(DNA).317–18.  In addition, Appellant's winding and nebulous DNA testing request, described in detail above, should be considered here, too. *See supra* Section II.  The record clearly supports that Appellant's Chapter 64 motion is part and parcel with Appellant's prior dilatory litigation.

---

[28]    As Appellant notes, he filed his *seventh* state habeas application on February 13, 2015.  Appellant's Br. 80 n.32.  This is about six months after Appellant promised to file it.  This would be another appropriate situation for the Court to take notice of in deciding the correctness of the trial court's decision.  *See Rosales*, 748 S.W.2d at 456.

Appellant argues that the trial court should not have taken his litigation history into account in determining unreasonable delay because, essentially, he thinks it is irrelevant. Appellant's Br. 76–86. But, an individual's prior actions can be used for a variety of purposes, including proving intent, plan or habit. *See, e.g.*, Tex. R. Evid. 404(b), 406. Thus, because Appellant shouldered the burden of proof to establish no unreasonable delay of his execution or administration of justice, his litigation history became relevant as it would in any case of establishing diligence. The trial court's decision finding unreasonable delay was well-supported by the record and should be upheld on appeal.

## V. Appellant failed to prove chain of custody for items housed by the Bastrop District Clerk.

A convicted person must prove that the items he or she seeks to test have "been subjected to a chain of custody sufficient to establish that [the items have] not been substituted, tampered with, replaced, or altered in any material respect." Tex. Code Crim. Proc. art. 64.03(a)(1)(A)(ii). In short, a convicted person "is not entitled to DNA testing unless he first shows that *unaltered* evidence available for testing." *Prible v. State*, 245 S.W.3d 466, 467 (Tex. Crim. App. 2008) (emphasis added). Appellant

failed in his proof, at least with respect to items housed by the Bastrop District Clerk.

A postconviction investigator testified at Appellant's Chapter 64 hearing that all of the items in possession of the Bastrop District Clerk are stored comingled and without protective covering.[29] 4.RR(DNA)178–83. As a certified peace officer with a background in collection of evidence, 4.RR(DNA).183–84, the postconviction investigator testified that he believed that the storage of these items allowed for contamination, were materially altered, and were tampered with, 4.RR(DNA).185–86.

A deputy clerk testified that several other exhibits—seemingly the paper goods Appellant (maybe) no longer wants to test—were stored in the same manner as the other exhibits—together and without prophylactic measure. 4.RR(DNA).193–94.

Finally, the lead trial prosecutor in Appellant's case testified that, once the items introduced at trial were handled without gloves by

---

[29] The items in possession of the Bastrop District Clerk are found in Appellant's Exhibit 2. 5.RR(DNA).DX2. Appellant (maybe) requests testing of the following items in that official's possession: blue pants; panties; socks; shoes; bra; nametag; white t-shirt; belt; earring; HEB-branded shirt; knife with metal cover; pieces of a green cup; and brown planner.

attorneys, court personnel, and jurors, in accord with the standards of that time. 4.RR(DNA).198–201.

Paolucci, on cross-examination, conceded that there is "a good chance [that the evidence in possession of the Bastrop District Clerk is] contaminated evidence." 2.RR(DNA).72. And Lankford testified that the comingled storage was "not ideal," with the possibility that each item has the DNA of more than a dozen people on it. 3.RR(DNA).149–52. She also conceded that, hypothetically, if someone opened the sealed packaging of evidence in a DNA laboratory and then touched the item ungloved, that would prove "you've tampered with our evidence." 3.RR(DNA).155.

The evidence before the trial court, and Appellant's witnesses' concessions, readily establish that the items in the possession of the Bastrop District Clerk's Office have been "tampered with" or "altered in any material respect." Tex. Code Crim. Proc. art. 64.03(a)(1)(A)(ii); *see Pate v. State*, No. 10-09-00360-CR, 2011 WL 652920, at *1 (Tex. App.— Waco Feb. 23, 2011, pet. ref'd) ("The items in question were trial exhibits, and therefore, handled by numerous persons during the trial."); *Riggins v. State*, No. 11-03-00307-CR, 2004 WL 743742, at *1 (Tex. App.— Eastland Apr. 8, 2004, no. pet.) (agreeing that evidence stored without

temperature controls by a district clerk was insufficient to prove an adequate chain of custody).

In arguing otherwise, Appellant ignores "tampered with" or "altered in any material respect." Appellant's Br. 86–89. But his witnesses conceded this point. While it can be said with certainty where these items are housed, that is not all that is required as the statutory definition reflects. Tex. Code Crim. Proc. art. 64.03(a)(1)(A)(ii). And, while these items might still be "in a condition making DNA testing possible," Tex. Code Crim. Proc. art. 64.03(a)(1)(A)(i), which was the primary thrust of Appellant's witnesses' testimony, that is a different requirement than chain of custody, Tex. Code Crim. Proc. art. 64.03(a)(1)(A)(ii). Appellant did not prove that requirement here and the trial court's decision should be affirmed on such basis with respect to those items in the possession of the Bastrop District Clerk.

## VI. Appellant did not prove biological material on the non-per se items he sought to test.

Under Chapter 64, DNA testing is only permitted for evidence "containing biological material." Tex. Code Crim. Proc. art. 64.01(a–1). The meaning of this statute is clear—this Court has "explicitly held that [a convicted person] must *prove* biological material exists and not that it

is merely probable." *Swearingen*, 424 S.W.3d at 38. Appellant failed in this endeavor.

Appellant tried to prove biological material existed on a variety of items—because of Appellant's lack of clarity, however, the State is still unsure exactly what he seeks to test—but ultimately failed to do so.[30] Paolucci conceded that he had not physically examined the evidence and had no personal knowledge as to how Stites was murdered. 2.RR(DNA).64–65. And he conceded that there was no way to know if there was biological material on any of these items unless DNA testing was performed on them. 2.RR.(DNA).67. Further, Paolucci admitted that "you can't say for sure where—where these items were touched." 2.RR(DNA).75.

Lankford, too, conceded that "the only way to know for sure [if there is biological material] is to test the[ item] and obtain a DNA profile." 2.RR(DNA).143. Indeed, she stated that "I couldn't testify to there being a biological stain, for instance, on an item of clothing without testing it."

---

[30] Assuming that Appellant currently only seeks to test those items addressed on appeal, the non-per se biological material items are: blue pants (in the areas he seeks to test); panties (in the areas he seeks to test); socks; shoes; bra; nametag; hand bags; white t-shirt; belt; beer cans; condom; pen; earring; HEB-branded shirt; knife with metal cover; pieces of green cup; brown planner; lighter; box cutter; and Big Red gum pack.

2.RR(DNA).148.   And, like Paolucci, Lankford could not say where any particular item had been handled such that skins cells might have been deposited.  2.RR(DNA)148–49, 169.

With respect to the non-per se physical items in this case, Appellant did not prove there was biological material in any particular location. Even if the Court assumes that "touch" DNA will be deposited from every contact with human skin, all of Appellant's witnesses conceded that they could not prove where any particular item had been so manipulated.  As such, this case is no different than *Swearingen*, where a convicted person's expert said it was likely that certain items had skin cells on them.  *See Swearingen*, 424 S.W.3d at 37–38.  But that is not enough.

Further, there was trial testimony that on many of the items Appellant requests to be tested there were "no stains of evidentiary value on them."  49.RR.89–93.[31]  And nothing was collected from underneath Stites's fingernails because they were too short, so Appellant cannot prove biological material on the hand bags either.  44.RR.163.  The trial

---

[31]     This includes the: white T-shirt; white flakes; bra; paper napkin; white paper sheet; knee brace; and HEB-branded shirt.  49.RR.89–90.

court's decision should be affirmed, at least with respect to the non-per se biological material items, on this basis too.

## VII. The State re-urges its motion to accelerate this appeal.

On January 27, 2015, the State moved this Court to accelerate Appellant's appeal. State's Motion for Accelerated Appeal, *Reed v. State*, No. AP-77,054 (Tex. Crim. App. Jan. 27, 2015). As apparent from the arguments above, Appellant has engaged in piecemeal and dilatory litigation tactics and it is clear that Appellant's Chapter 64 motion and the attendant appeal have been filed to unreasonably delay the execution of his sentence and the administration of justice. As such, the State respectfully re-urges the motion to accelerate for purposes of this Court's decisional process. Appellant should not be allowed to delay his presently scheduled execution date.

## PRAYER FOR RELIEF

The State respectfully requests that the Court affirm the trial court's decision denying Appellant's request for DNA testing pursuant to Chapter 64.

Respectfully submitted,

BRYAN GOERTZ
Criminal District Attorney
Bastrop County, Texas

 /s/ Matthew Ottoway
MATTHEW OTTOWAY
Assistant Criminal District Attorney/
Assistant Attorney General
Texas Bar No. 24047707

Post Office Box 12548, Capitol Station
Austin, Texas 78711
Tel.: (512) 936-1400
Fax: (512) 320-8132
Email: *matthew.ottoway@texasattorney general.gov*

*Attorneys for the State*

**WORD-LIMIT CERTIFICATE OF COMPLIANCE**

This brief complies with Rule 9.4(i)(2)(A) of the Texas Rules of Appellate Procedure. It contains 12,125 words, Microsoft Word 2013, Century Schoolbook, 14 points.

/s/ Matthew Ottoway
MATTHEW OTTOWAY
Assistant Criminal District Attorney/
Assistant Attorney General

**CERTIFICATE OF SERVICE**

I do hereby certify that a true and correct copy of the foregoing pleading was served by placing same in the United States mail, postage prepaid, on this the 23rd day of February, 2015, addressed and electronically sent to:

Bryce Benjet
40 Worth Street, Suite 701
New York, New York, 10013
*bbenjet@innocenceproject.org*

Andrew F. MacRae
LEVATINO PACE LLP
1101 S. Capital of Texas Hwy.
Building K, Suite 125
Austin, Texas 78746
*amacrae@levatinopace.com*

Mark S. Chehi
Robert A. Weber
Jason M. Liberi
Nicole A. DiSalvo
Andrew G. Mirsis
SKADDEN, ARPS, SLATE, MEAGHER &
    FLOM LLP
One Rodney Square, P.O. Box 636
Wilmington, Delaware 19899
*mchehi@skadden.com*
*robert.weber@skadden.com*

/s/ Matthew Ottoway
MATTHEW OTTOWAY
Assistant Criminal District Attorney/
Assistant Attorney General